# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHAUN A. HOUSE, individually and on behalf of all other similarly situated, | |
| Plaintiff, | No. 17 C 5018 |
| ROBERT CARLYLE, | |
| Plaintiff, | No. 17 C 5022 |
| DEMETRIOS PULLOS, individually and on behalf of all other similarly situated, | |
| Plaintiff, | No. 17 C 5026 |
| v. | Judge Thomas M. Durkin |
| AKORN, INC.; JOHN N. KAPOOR; KENNETH S. ABRAMOWITZ; ADRIENNE L. GRAVES; RONALD M. JOHNSON; STEVEN J. MEYER; TERRY A. RAPPUHN; BRIAN TAMBI; and ALAN WEINSTEIN, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

As the Court has recounted in greater detail in previous opinions, Plaintiffs in these cases sued Akorn and members of its board of directors seeking certain disclosures regarding a proposed acquisition by Frensenius Kabi AG. *See* 17 C 5018, R. 53 (*House v. Akorn, Inc.*, 2018 WL 4579781 (N.D. Ill. Sept. 25, 2018)); 17 C 5016, R. 81 (*Berg v. Akorn, Inc.*, 2017 WL 5593349 (N.D. Ill. Nov. 21, 2017)). After Akorn revised its proxy statement and issued a Form 8-K, Plaintiffs dismissed their lawsuits and settled for attorney's fees. Shortly thereafter, Theodore Frank, an owner of 1,000

Akorn shares, sought to intervene to object to the attorneys' fee settlement. The Court eventually denied Frank's motion to intervene, but in light of Frank's arguments, ordered Defendants to file a brief addressing whether the Court should exercise its inherent authority to abrogate the settlement agreements under the standard set forth *In re Walgreen Co. Stockholder Litigation*, 832 F.3d 718, 725 (7th Cir. 2016). The Court also invited Frank to file an opposition brief as an amicus curiae, which he did. The parties then filed reply briefs, and briefs on supplemental authority. The Court now addresses whether the settlements should be abrogated.

SEC Rule 14a-9 requires disclosure in proxy statements of all "material fact[s] necessary in order to make the statements therein not false or misleading." *See* 17 C.F.R. § 240.14a-9(a). The Supreme Court has held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In other words, omitted information is material if there is

> a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Id.* Accordingly, "[o]mitted facts are not material simply because they might be helpful." *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000); *see also TSC Indus.*, 426 U.S. at 449 n.10 (noting "the SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse

consequences of setting too low a threshold for civil liability"); *Wieglos v. Com. Ed. Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("Reasonable investors do not want to know everything that could go wrong, without regard to probabilities; that would clutter registration documents and obscure important information. Issuers must winnow things to produce manageable, informative filings.").

The Seventh Circuit heightened this standard in the context of reviewing approval of a class settlement of claims for disclosures under Rule 14a-9. *See Walgreen*, 832 F.3d at 723-24. Adopting a standard set by the Delaware Court of Chancery in similar cases, the court held that disclosures must be "plainly material . . . . mean[ing] that it should not be a close call that the . . . information is material." *Id.* at 725 (quoting *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 894 (Del. Ch. Ct. 2016)).

Plaintiffs claim that their complaints caused Akorn to make additional disclosures in the revised proxy and Form 8-K, which in turn precipitated their settlement. The parties' briefs focus on whether these additional disclosures are plainly material justifying the settlement. This would be the appropriate perspective if the Court was reviewing a class settlement. *See Walgreen*, 832 F.3d at 724 ("No class action settlement that *yields* zero benefits for the class should be approved . . . .") (emphasis added). But no class was certified here, nor were any class claims released in the settlement. Thus, as the Court explained in its previous order, the case is in the procedural posture suggested by the second half of the sentence from *Walgreen* just quoted: ". . . a class action that *seeks* only worthless benefits for the

3

class should be dismissed out of hand." *Id.* (emphasis added). To determine whether Plaintiffs' cases should have been "dismissed out of hand"—in which case the settlement agreements should be abrogated—the Court must assess whether the disclosures Plaintiffs' *sought* in their complaints—not the disclosures Akorn made after the complaints were filed in the revised proxy and Form 8-K—are plainly material.[1]

### 1. GAAP Reconciliation

All three plaintiffs sought GAAP reconciliation of the proxy's projections.[2] Plaintiffs argue that such reconciliation was necessary because GAAP is the format in which "Akorn traditionally disclosed its financial results." R. 65 at 10. But while such reconciliation might be helpful, the applicable SEC regulation requiring GAAP reconciliation does "not apply to . . . a disclosure relating to a proposed business combination." 17 C.F.R. § 244.100(d); *see also* Securities Exchange Commission Discl. 5620589, Question 101.01 (Oct. 17, 2017), available online at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm. Although this regulation does not directly address materiality, the Court finds it highly persuasive

---

[1] Frank questions whether Plaintiffs could have caused the disclosures because plaintiffs Carlyle and Pullos filed their complaints after the revised proxy was issued, and plaintiff House's complaint was filed only days before. The parties dispute whether the disclosures contained in the Form 8-K, which was filed after all three complaints, were necessary to make settlement possible. But since the Court holds that analysis of the materiality of the disclosures sought is the relevant issue, and not the materiality of the disclosures actually made, these causation questions are irrelevant.

[2] *See* 17 C 5018 (House), R. 1 ¶¶ 36, 41; 17 C 5022 (Carlyle), R. 1 ¶ 51; 17 C 5026 (Pullos), R. 1 ¶ 36.

4

in that regard. Other district courts have reached a similar conclusion. *See Assad v. DigitalGlobe, Inc.*, 2017 WL 3129700, at *6 (D. Colo. Jul. 21, 2017); *Bushansky v. Remy Intl., Inc.*, 262 F. Supp. 3d 742, 748 (S.D. Ind. 2017).

Plaintiffs argue that GAAP reconciliation "revealed that the November 2016 Projections assumed steady increases in [Akorn's] net income consistent with Akorn's past performance, while the lowered March 2017 Projections assumed a sudden drop in Akorn's near term performance, which was inconsistent with Akorn's recent financial performance." R. 65 at 11. But it is obvious that a lower projection implies lower net income. Disclosure of a lower projection already constitutes disclosure of the company's opinion that the company will earn lower net income. Plaintiffs do not explain why the specific net income numbers were material to shareholders' ability to evaluate the merger. Therefore, the Court finds GAAP reconciliation is not plainly material.

### 2. Components of J.P. Morgan's Analysis

Plaintiffs House and Pullos also sought certain "components" of J.P. Morgan's analysis (J.P. Morgan was Akorn's merger advisor): "(i) the inputs and assumptions underlying the calculation of the discount rate range of 8.0% to 10.0%; (ii) the range of terminal values to which the growth rate range was applied; and (iii) the inputs and assumptions underlying the calculation of the terminal value growth rates."[3] Similarly, Plaintiff Carlyle sought "the basis" for the growth rate J.P. Morgan chose.[4]

---

[3] *See* 17 C 5018 (House), R. 1 ¶ 43; 17 C 5026 (Pullos), R. 1 ¶ 43.
[4] *See* 17 C 5022 (Carlyle), R. 1 ¶¶ 49.

5

But this information was already in the original proxy. As to (i), the proxy states that the range of 8.0% to 10.0% "was chosen by J.P. Morgan based upon an analysis of the weighted average costs of capital of the Company." R. 65-1 at 54 (p. 44). As to (ii), the proxy states that the range of terminal values was calculated by "applying terminal value growth rates ranging from 0.0% to 2.0% to the unlevered free cash flows for the Company during the final year of the ten-year period of the March 2017 Management Case." *Id.* As to (iii), growth rates are simply a choice. Shareholders can evaluate Akorn's valuation and merger price by making their own determination of whether a growth rate range of 0-2% is reasonable in light of the company's prior performance. Generally, with respect to data underlying a financial advisor's opinion, courts find that only a "fair summary" must be disclosed, meaning that the company "does not need to provide sufficient data to allow the stockholders to perform their own independent valuation." *Trulia*, 129 A.3d at 901. The data sought by House and Pullos was not material to evaluating the merger proposal. Carlyle's more general demand for "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business," is even less material.

3. **J.P. Morgan's Compensation from Akorn**

All three plaintiffs sought disclosures regarding J.P. Morgan's compensation from Akorn and Fresenius. As to J.P. Morgan's "specific compensation figures,"[5] Akorn disclosed that information in the original proxy:

---

[5] 17 C 5018 (House), R. 1 ¶ 45; 17 C 5022 (Carlyle), R. 1 ¶ 56; 17 C 5026 (Pullos), R. ¶ 44; *see also* 17 C 5022 (Carlyle), R. 1 ¶ 54.

6

> J.P. Morgan received a fee from the Company of $3 million, paid upon the public announcement of the merger, which will be credited against any Services Fee (as defined below). For services rendered in connection with the merger, the Company has agreed to pay J.P. Morgan an additional fee equal to 1.0% of the total amount of cash paid to the Company's common stockholders . . . immediately prior to the consummation of the merger (the "Service Fee"), which in this case amounts to approximately $47 million.

R. 65-1 at 55 (p. 45). Plaintiffs argue that this quote is taken out of context and does not specifically indicate whether the fee is contingent on the consummation of the merger. *See* R. 65 at 14 & n. 13. The Court has reviewed the context of this quote and finds that it does not change its meaning. The amount of potential compensation ($47 million) is abundantly clear.

The revised proxy added language expressly stating that J.P. Morgan's fee was "contingent and payable upon the closing of the merger." R. 85-2 (17 C 5016) at 22 (p. 45). But Plaintiffs did not seek this information in their complaint. And in any case, although the fact that J.P. Morgan's fee is contingent on consummation was not expressly stated in the original proxy, such an arrangement is certainly customary, and can be inferred from the fact that the amount of the fee will ultimately be measured only "immediately prior to consummation" and is defined as a percentage of the amount to be paid in the transaction. Even if Plaintiff had sought this information in their complaint, it is not plainly material.

4. **J.P. Morgan's Compensation from Fresenius**

Although Plaintiffs do not address it in their current briefing, they also sought disclosure of "the exact amount of money J.P. Morgan received and may continue to

7

receive from [Fresenius] while acting as Akorn's financial advisor."[6] The Court finds the exact historical payments are not material. *See Bushansky*, 262 F. Supp. 3d at 753 ("Additionally, Plaintiffs have not presented any evidence or case law establishing that the inclusion of historical fees in similar situations is material."). And the proxy does not indicate that J.P. Morgan was "continuing" to receive payments from Fresenius in any event.

### 5. "Upside" of the "Stand-Alone Strategic Plan"

Plaintiff Carlyle sought four additional disclosures not sought by Plaintiffs House or Pullos. First, Carlyle sought the following disclosure:

> The Proxy also refers to "the potential upside in the Company's stand-alone strategic plan," which the Board purportedly considered in determining to recommend approval of the Proposed Transaction. Proxy at 39. Yet, the Proxy fails to disclose any further information concerning that "stand-alone strategic plan" or its "potential upside" or exactly why the Board determined it would be in the best interest of the Company and its shareholders to pursue potential strategic alternatives rather than a stand-alone strategic plan.

17 C 5022, R. 1 ¶ 46; *see also id.* ¶ 45. It is apparent from context that "stand-alone" means Akorn not merging with another company. The "upside" of that scenario is also readily apparent, in that avoiding merger means avoiding the costs and the relinquishment of control inherent to the merger. The proxy explains that the Board believed "that the Company's stand-alone strategic plan involved significant risks in light of the industry and competitive pressures the Company was facing and the

---

[6] *See* 17 C 5018 (House), R. 1 ¶ 46; 17 C 5022 (Carlyle), R. 1 ¶ 55; 17 C 5026 (Pullos), R. 1 ¶ 46.

Board's concerns with respect to the risks relating to the Company's ability to execute on its strategic plan including the possibility that the strategic plan may not produce the intended results on the targeted timing or at all." R. 65-1 at 47 (p. 37). Although the proxy does not detail what "industry risks" and "competitive pressures" the company faced, it is sufficient for the Board to express such concerns generally. Moreover, the Board translated those concerns into financial projections that were provided in the proxy. While it may have been helpful or interesting for shareholders to learn greater detail about how management perceived the industry landscape, such information was not necessary for shareholders to evaluate the merger. Furthermore, Carlyle settled the case without receiving this information. That fact casts significant doubt on whether this information was truly material.

### 6. "Substance" of the March 2017 Projections

Carlyle also sought disclosure of "complete information concerning the substance of the March 2017 [projections] or the assumptions, analysis, projections, or conclusions reflected therein," 17 C 5022, R. 1 ¶ 48, and the "financial analyses and forecasts" J.P. Morgan reviewed, *id.* ¶ 50. But "completeness" is not the standard. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("incomplete" statements are not necessarily "misleading"). Further, there is presumably a great deal of information underlying the March 2017 projection on which the proxies rely. Carlyle does not identify what information in particular was necessary for shareholders to be able to evaluate the merger. And again, Carlyle settled without receiving this information, casting doubt on its materiality.

9

### 7. Other Potential Buyers

Carlyle contends that the proxy should have detailed the other potential buyers the Board considered and why the Board determined that "it was highly unlikely that any of those counterparties would be interested in an acquisition of the Company at that time due to competing strategic priorities and recent acquisitions in the industry." 17 C 5022, R. 1 ¶¶ 58-59. But this statement speaks for itself regarding why the Board rejected other companies in the industry as potential buyers. And as Carlyle notes, the proxy gives much greater detail regarding the one other company ("Company E") Akorn actually considered. Detailed information about potential buyers Akorn did not actually consider is not material.

### 8. Pending Litigation

Finally, Plaintiff Pullos alleges that "the Board may be using the Proposed Merger as a vehicle to salvage their professional reputations and potentially absolve themselves of liability arising from federal securities and related derivative litigation currently pending in the Northern District of Illinois." 17 C 5026, R. 1 ¶ 47. Pullos claims that the proxy improperly "fails to disclose whether these lawsuits were discussed by the Board and whether the Board took them into account when deciding to undertake the sales process and enter into the Merger Agreement." *Id.* But the lawsuits were public record prior to issuance of the original proxy, and Pullos's allegation that the Board had ulterior motives for the merger related to the lawsuits is unfounded and does not seek "information" relevant to the merger. To the extent the Board might have had ulterior motives, that is not information that is

"disclosable" in the sense required here. The proxy in its entirety is a refutation of Pullos's allegation in that the proxy gives reasons unrelated to the lawsuits for supporting the merger. Pullos's unfounded speculation about the Board's motives does not constitute an information request. And similar to Carlyle's claims, the fact that Pullos settled without provision of information related to this claim indicates that it was not material.

**Conclusion**

Therefore, the Court finds that the disclosures sought in the three complaints at issue were not "plainly material" and were worthless to the shareholders. Yet, Plaintiffs' attorneys were rewarded for suggesting immaterial changes to the proxy statement. Akorn paid Plaintiffs' attorney's fees to avoid the nuisance of ultimately frivolous lawsuits disrupting the transaction with Frensenius. The settlements provided Akorn's shareholders nothing of value, and instead caused the company in which they hold an interest to lose money. The quick settlements obviously took place in an effort to avoid the judicial review this decision imposes. This is the "racket" described in *Walgreen*, which stands the purpose of Rule 23's class mechanism on its head; this sharp practice "must end." 832 F.3d at 724.

Plaintiffs' cases should have been "dismissed out of hand." *See id.* at 724. Since the Court failed to take that action, the Court exercises its inherent authority to rectify the injustice that occurred as a result. *See Dale M., ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 282 F.3d 984, 986 (7th Cir. 2002). The settlement agreements are abrogated and the Court orders Plaintiffs'

counsel to return to Akorn the attorney's fees provided by the settlement agreements. Plaintiffs' counsel should file a status report by July 8, 2019 certifying that the fees have been returned.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: June 24, 2019